was the appellant in this case. The issue I want to discuss this morning is the enhancement for four levels under 2C1.1b3 that he received as a public official in a high-level decision-making or decision-making position. The application note gives a definition as a position characterized by a direct authority to make decisions for or on behalf of a government department, agency, or other government entity, or be a substantial influence over the agency administrator, other public official with similar level of authority, juror, law enforcement officer, election official, or others similarly situated. Raushi Conrad was a front-level, front-line supervisor and not a high-level decision-maker. He was of Commerce. He supervised four people. The Bureau of Industry and Security employs 350 people. His section was one of four sections under the Office of the Chief Information Officer. Right, but Mr. Yamamoto, in making this presentation, if you could address the application note to the guideline that talks about a substantial influence over the decision-making process, because it's an either-or, direct authority to make the decision, which clearly he didn't have in this case, but it says or by a substantial influence over the decision-making process. So why wasn't that the case here? Because he had no influence outside the Commerce Department. He recommended Bedford Images. He told his subordinate to recommend Bedford Images. He told his subordinate that the award should be hired. But later on, he testified that, one, he didn't have the, he wasn't a warranted contract officer and couldn't issue the contract. He never testified, and there is no testimony that the warranted contract officer was ever informed of Bedford Images. No indication of Bryant having any influence in the selection of Tridea as the prime in this case. Now, Bedford, Bryant, I get these odd names confused. Bryant goes on to say that he did not have any influence over the selection by Tridea of Bedford. He says on page 462 of the transcripts that he could not tell Tridea which subcontractor to offer, to select. On 464, he says he never put Tridea under any pressure on which contractor, subcontractor to select. 467, he says he did not command Tridea to use Bedford. He passed Bedford to Tridea as a possible option, not a command. But he didn't identify anybody else. He just identified Bedford, didn't he? We don't know. The only person that was the subject of the testimony was Bedford, so he may have, he may not have. He doesn't ever say he didn't give anybody else. Now, Hoder says, Hoder of Tridea says that he did recommend Bedford, but he doesn't say that Bedford was the only one recommended. So we have no clue. But Bryant goes on to testify that he doesn't have any influence over the prime because it's between the prime and the contracting officer as to who to hire as a sub. So he backs away from his initial testimony that it was Conrad who influenced the decision to hire Bedford and essentially says nothing. Well, Conrad recommended Bedford and no one else, right? Pardon? Conrad recommended Bedford and no one else. That's correct, but that doesn't mean that Bedford was the only one that the contracting officer and Tridea considered. Bedford would have been added to the list of people. Now, the other thing to consider in this is Bedford, and it's not really clear, but you have to sort of fish around the transcripts to find this. Bedford was already working as Team America for Tridea. That happened before this data migration project came up. You see when Tridea talks about the checks to Bedford, he says you have to look at the invoices to see which project is being paid. The data migration project or the other project or projects that Bedford and Tridea. Well, I thought the other work was construction work. It was construction work. It's not like they were doing two data migration projects. That's correct, Your Honor. I'm not saying that they were doing two data things, but Tridea does indicate that they're paying Bedford one check for two different projects. They constructed a SCIF or something like that? Well, that's a whole lot different than what we're talking about here. Correct. Completely different. But as far as Tridea and Bedford and Team America knowing each other, they knew each other before the data migration project came up. If this set of facts are true, the question would be how does it play into your argument on the enhancer? Holder works for Tridea. He hired Bedford Images as a subcontractor because Bryant told him to. Well, we would contend that Bryant didn't tell him to. Bryant testifies that he didn't tell Tridea to hire him, that he recommended it, that it was up to Tridea. As I indicated, he couldn't tell Tridea who to select. He didn't put any pressure on Tridea on which contractor to hire. He didn't command Tridea to use Bedford. Tridea was given Bedford as a possible option, not a command, and he couldn't tell Tridea who to hire as a subcontractor. He had no influence on who Tridea would hire, and Tridea had to go through the contracting office to select the subcontractor. All those are statements made by Bryant after he says that Conrad was emphatic about hiring Bedford. But what about the continuation of work? We're just talking about the inception of the contract. Why didn't he at least exercise substantial influence over the continuation of the contract? Bedford employees were messing up right and left. They obviously were incompetent. They didn't know what they were doing, at least according to this record, and your client wants to continue them on the job. He produces fake invoices. I mean, why isn't that to justify the continuation of payments? Why isn't that very strong evidence of substantial influence? Does it have to only be getting the initial contract, or can the substantial influence continue throughout the continuation of the contract where more money was awarded incrementally? Good question, Your Honor. The answer is there was a lot. Bedford and Tridea signed a contract. Conrad and the Commerce Department had nothing to do with that contract. That contract was between Spaward, Tridea, and Bedford. So Hoder of Tridea indicates that no one ever talked to him, or he never talked to Bedford about the work that Bedford was doing, had no idea what the work was, didn't know what data migration was, and apparently took no notice of anything except getting the invoices from Bedford and turning them over to Spaward, who turned them over to Commerce, to be paid. There's a distinct lack of communication between BIS, the Bureau of Industry and Security, Spaward, and Tridea. The complaints were all within the Commerce Department. There's no question about that. The work from Alta testimony was horrible. But there's no indication that anything was told to the prime who held the contract. Commerce didn't have anything to do with that contract. So that's where one of the issues lies in this case. This is a totally screwed-up case with totally screwed-up facts. You have the Commerce Department, you have BIS, which is an agency within the Commerce Department, can't make the contract. It has to go to a Navy department, Spaward, who goes and finds a contractor, hires that contractor. That contractor is not – the contract's not between Commerce and Tridea or Bedford. That contract is between the Navy department, Spaward, Tridea, and Bedford. So they're doing the work for Commerce, but Commerce may be the beneficiary of it, but it's got nothing to do with the contract. That's a short answer in a long way. All right, sir. Is there anything further? Well, I'm going to go on with my other argument about the four levels. Conrad supervises four people in BIS. As I said, there are four sections in BIS – excuse me, not BIS – in the Office of the Information Officer. BIS has four sections. There are 350 employees in the Bureau of Industry and Security. Conrad supervises five. There are 12 bureaus within the Commerce Department and a number of other offices. So are you arguing that we're simply supposed to consider an appellant's position and decision-making authority in general as a public official as opposed to in the specific context of this crime? Well, I think you have to do both because the question is whether he is a high-level decision-making authority, not whether he's a decision-making authority. There's no question he's a decision-making authority. Okay, but is it a question of whether he's a high-ranking decision-maker in all of government or whether he's a high-ranking decision-maker in this crime? Again, both. I refer you to the United States. Okay, so if we find that he was a high-ranking decision-maker in the context of this crime because he directed the contract to be awarded to this particular company, what does it matter where he falls in all of government? And there would be clear error of review, wouldn't there, of that determination? Well, I think there's Fourth Circuit precedent, United States v. Weston, 962 Fed 2nd 8th, where Weston was a public works officer at the Naval Academy. He supervised all new construction and all maintenance of the buildings and grounds there. He had a warrant and issued all new contracts and a warrant for new contracts for building and repairs up to a million dollars. Weston had his director of construction go to a particular contractor, in this case, to solicit gifts, and he got gifts. In exchange, Weston made the contractor a preferred contractor and was given contracts not advertised to the public. Do you agree this is clear error of review? Well... Okay. I'd like to say no. In one case, he gave the contractor a contract for a bid that was 50 percent over budget. Weston manipulated the contract process to award his friends skirted Navy regulations. And this is what the court said. It's apparent that any official to whom a gratuity may be offered or given will have some authority or apparent authority to make decisions that will affect the public fisc. That fact alone cannot distinguish an official from a multitude of personnel in the Federal Service. The steep enhancements provided by 2C1.1B2B is reserved for corruption by officials sitting in high positions of public trust. Important though he or she may be, the public works officer of the Academy, the clothe with a measure of discretion, is not at such a level. Okay. Now, Mr. Yalmira, I just want to warn you that you are getting into your rebuttal time. And if you want to use your rebuttal time, that's fine. But otherwise... I'll quit. Okay. Thank you, Your Honor. Thank you. Thank you. Mr. Burke. May it please the Court, Matthew Burke and Jamar Walker on behalf of the United States. The district court correctly applied the four-level enhancement because the evidence presented both at trial and at sentencing demonstrated that the defendant had substantial influence over the decision-making process. And what the testimony at trial established was that Rauji Conrad had an extraordinary ability to control not only the award of the initial contract, but also the continued performance under that contract, and the award of yet additional money under a new contract as the scheme progressed. The testimony, Judge Keenan, was that there was, in fact, only one contractor that was put forward for this work, and it was Bedford's Images. And the testimony was also that no one had heard anything about this company, Bedford's Images, or its capabilities in the realm of data migration-type work, before the defendant brought them to the attention of his subordinate, who ordinarily would have been the person who would have been in charge of looking for contractors. But also- Excuse me, Mr. Burke. I have a question that's a little off the grid. Yes. But how does this happen in the Federal government that, you know, somebody comes in, brings in his family members and friends who don't know anything about computers, and they get over a million dollars? How does this happen? Your Honor, I will tell you that Mr. Walker and I asked ourselves that exact same question throughout the investigation and prosecution of this case. And it certainly is a situation in which what you would ordinarily expect in terms of checks and balances were absent, and that there was a breakdown in the process. But I would submit, Your Honor, that that unfortunate circumstance was what created the opportunity for this crime to have occurred in the first place. There certainly should have been a lot more checks and balances. There certainly should have been more division of duties. There should have been more people looking and validating what happened. And there should have been some sort of bidding process or request for quotes. The problem here in this instance is that none of that happened. And the absence of all of that is what created the circumstances that enabled Mr. Conrad to wield a substantial influence over the decision-making process. As the testimony at trial made clear from numerous of his coworkers, including the acting chief information officer, Rashi Conrad had total control over this project. He was the one who decided, first of all, how they were going to do this data migration. Second of all, whether they were going to do it in-house or whether they were going to hire someone else. He, in effect, created the need to go outside the Department of Commerce to hire someone else. So it sounds to me like you're saying that the question of substantial influence in this case has to be related to the specific exercise of authority in this position, rather than the umbrella inquiry into how does a person with this title in the Commerce Department fit into the hierarchy. I believe that is the correct analysis, and I believe the support for that comes from United States v. Mattson. In that instance, this Court affirmed the application of this enhancement, and the person in question was a GS-15 who worked for the Department of Navy. Mr. Conrad was a GS-15. The public official in Mattson was not the Secretary of the Navy or a two-star admiral. It was someone who wielded substantial influence within their corner of the universe. But I do want to correct the record. If the analysis looks broader, not just to their influence with respect to the corrupted contract, and looks more broadly to the influence of this official sort of writ large, the record demonstrates that Mr. Conrad had substantial control and authority within the Department of Commerce. And Mr. Yamamoto, I believe here at oral argument, said that he supervised four people. That's inaccurate. There was an affidavit that we attached to our sentencing memorandum. It's in the Joint Appendix at page 1143, wherein Roushey Conrad describes in great detail the substantial responsibility and authority. He describes that he actually supervises a team of 27 people, seven immediate subordinates, and a team of additional 20 contractors, how he was responsible for the design, development, testing, documentation, and implementation of all IT-related products for the entire Bureau of Industry and Security. He managed this data. That's Mr. Conrad's affidavit? That's Mr. Conrad's own affidavit. That's correct. It was an affidavit that he submitted as a part of a prior administrative inquiry, but we located it in the course of our investigation, and we brought it to the district court's attention in the sentencing memorandum. And I'll also note that at trial there was testimony that Mr. Conrad was handling this data migration project for 500 people, and this involved the transferring of all their files. He was the one who decided what files got transferred. And to Your Honor, Judge Keenan's point, the influence here was not simply in the initial award of the contract. It was also in how this contract was performed. And, again, we go back to the unfortunate circumstance of the absence of checks and balances. There weren't, for example, task orders or some other independent party authorizing the additional expenditure of funds. What happened was Mr. Conrad was entirely in control of this, so every time he decided to bring another batch of files to James Bedford, he decided to authorize James Bedford to spend yet more money. And he did that over the course of this. He did it without any involvement from anyone else. He continued to feed them work even after his coworkers were complaining about the terrible quality of the work. And then after they had burned through all of the money on the initial contract and expended all of the budget, he went back to the budgeting officers and to the procurement officials at the Department of Commerce and made sure that yet another contract, this time directly from the Department of Commerce to James Bedford's company, the bribe payers' company, was awarded. And so all of that demonstrates that he had almost complete control over this data migration project. But the record more broadly shows that he had substantial authority throughout the Bureau of Industry and Security, that he oversaw substantial staff, that he had access to sensitive information, and that he had a great deal of authority that he was able to use to influence the decisions of government. And for all those reasons, we think that the district court did not clearly err in applying this enhancement. If there are no further questions about the other matters raised in Mr. Conrad's brief, the government rests on its brief and respectfully requests that the court affirm the conviction and sentence. All right. Thank you very much. Thank you, Judge. Rebuttal, please. Quickly, Your Honor, Matsken was a supervisory engineer in the Navy. He was also on a three-member panel that they call CARP, which was the Navy Contract Award Review Panel, which was responsible for review and recommending large Navy procurements. And the Navy wouldn't make any decision on who to award a contract without approval from CARP. So he may have been in the same situation as Mr. Conrad as far as being a GS-15 supervising a few people, but ultimately he was a member of a three-panel board in which the Navy put ultimate reliance in determining whether or not they should issue contracts. I'm not going to stand here and say that Rashi Conrad did good. Rashi Conrad did terrible. There's no question. And we don't deny that he had complete control over the data migration process within the Department of Commerce. That was his handling totally. The files to Bedford, Conrad would get files as the employees in BIS, and it was only BIS that was affected, not any of the other 11 bureaus or offices of the Commerce Department, only 350 out of 47,000 people. So referring back to the Weston case, is that 350 the same as the individual at the Naval Academy who had contracts that he was issuing for a million dollars and who ran the grounds and new buildings at the Navy? It's clearly not the same. And we would ask that the court take a hard look at the four-level increase. Now, ultimately, that may not matter for his sentence because he was sentenced to substantially less than the guidelines. So even with the four-level decrease, his guideline level was above the sentence he ultimately received. Thank you. All right, sir. Thank you very much. We'll ask the clerk to conclude court, and then we'll come down to Greek counsel. This honorable court stands adjourned, sign die. God save the United States and this honorable court.
judges: Barbara Milano Keenan, Henry F. Floyd, Stephanie D. Thacker